UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. _____ |
| Plaintiff, | |
| | VIOLATIONS: |
| v. | Count One:  18 U.S.C. § 371 |
| | (Conspiracy); |
| TYSON FOODS, INC., | Count Two:  15 U.S.C. § 78dd-1 (Foreign |
| Defendant. | Corrupt Practices Act); and |
| | 18 U.S.C. § 2  (Aiding and |
| | Abetting) |

# INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

At all times material to this Information (unless specified otherwise):

## GENERAL ALLEGATIONS

*The Foreign Corrupt Practices Act*

1.  The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person.  The FCPA also requires that any issuer of securities shall make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

*Relevant Entities and Individuals*

2.     Tyson Foods, Inc. was incorporated in Delaware and had its principal place of business in Springdale, Arkansas.  It issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), which traded on the New York Stock Exchange.  As such, it was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, Tyson Foods, Inc. was an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a).  By virtue of its status as an issuer, Tyson Foods, Inc. was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of Tyson Foods, Inc. and its subsidiaries, including the subsidiary described below, which were incorporated into the books of Tyson Foods, Inc.

3.     Tyson de Mexico ("TdM"), a wholly-owned subsidiary of Tyson Foods, Inc., produced protein-based and prepared food products for sale in Mexico and foreign countries other than the United States.  TdM was headquartered in Gomez Palacio, Mexico, and maintained three meat-processing factories there.

4.     "Executive," a U.S. citizen, was an officer and senior executive at Tyson Foods, Inc., was General Manager of TdM, and later was President of Tyson International, a subdivision of Tyson.

5.     "VP International," a U.S. citizen, was a plant manager for TdM and subsequently Vice President of Tyson International for Operations.

6.     "VP Audit," a U.S. citizen, was Vice President of Tyson for Internal Audit.

7.    "Accountant," a U.S. citizen, was an accountant for Tyson with responsibility for TdM and later was General Manager for TdM.

8.    "GM TdM," a Mexican citizen, was General Manager of TdM.

*Background*

9.    The Government of Mexico administers an inspection program, *Tipo Inspeccion Federal* ("TIF"), for meat-processing facilities. Any company that exports meat products from Mexico must participate in the inspection program, which is supervised by an office in the Mexican Department of Agriculture ("SAGARPA"). The inspection program at each facility is supervised by an on-site veterinarian who is a government employee ("TIF veterinarian"), paid by the state, who ensures that all exports are in conformity with Mexican health and safety laws. Therefore, TIF veterinarians are foreign officials as defined by the FCPA, 15 U.S.C. § 78dd-1(f).

10.    There are two categories of TIF veterinarians: "approved" and "official." Although all TIF veterinarians are foreign officials under the FCPA, Mexican law permits approved veterinarians to charge the facility in which they work a fee for their services in addition to their official salary. Official veterinarians receive all of their salary from the Mexican government and may not be paid by the facility they supervise.

11.    In or around 1994, Tyson acquired a controlling stake in TdM. At the time of acquisition, one TdM facility participated in the TIF program and had an approved TIF veterinarian located on-site. Subsequently, another TdM facility participated in the program and also had a TIF veterinarian on site. These two TIF veterinarians each supervised a number of inspectors, who were employees of TdM.

## COUNT ONE
### (Conspiracy)

THE CONSPIRACY AND ITS OBJECT

12.     Paragraphs 1 through 9 of this Information are realleged and incorporated by reference as if set out in full.

13.     From in or around July 2004 through in or around November 2006, within the territory of the United States and elsewhere, Tyson, TdM, and others, known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree to commit the following offenses against the United States:

    a.     to offer, pay, promise to pay, and authorize the payment of any money, and to offer, give, promise to give, and authorization of the giving of anything of value to any foreign official, or to any person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to any foreign official, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist Tyson, TdM, and others, in obtaining and retaining business for and with, and directing business to, Tyson, in violation of Title 15, United States Code, Section 78dd-1; and

    b.     to knowingly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of

the assets of Tyson, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

## PURPOSE OF THE CONSPIRACY

14.     The primary purpose of the conspiracy was to assist Tyson and TdM in the export of meat products from Mexico through the payment and promise of payment of things of value to Mexican government-employed TIF veterinarians, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program.

## MANNER AND MEANS OF THE CONSPIRACY

15.     To achieve the goal of the conspiracy, Tyson and others used the following manner and means, among others:

a.      It was part of the conspiracy that Tyson, its executives, subsidiaries, and employees agreed to make regular payments to TIF veterinarians on the basis of invoices submitted by the veterinarians, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program.

b.      It was a further part of the conspiracy that Tyson, its executives, subsidiaries, and employees agreed to place the wives of the TIF veterinarians on TdM's payroll, providing them with a salary and benefits, knowing that the wives did not actually perform any services for TdM, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program.

      c.    It was a further part of the conspiracy that, from in or around August 2004 to in or around November 2006, upon termination of the salaries to the wives of the TIF veterinarians, Tyson, its executives, subsidiaries, and employees agreed to increase the amount paid to the veterinarians based on false invoices by the same amount as the salaries previously paid to their wives, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program, which payments totaled approximately $90,000. From the time of Tyson's acquisition of TdM in 1994 until May 2004, an additional $260,000 in improper payments were made to the TIF veterinarians, both directly and indirectly, including through payments to wives of the TIF veterinarians.

      d.    It was a further part of the conspiracy that Tyson, its executives, subsidiaries, and employees falsely recorded the payments on its books and records as "professional fees" and salaries in order to conceal the true nature of the improper payments in the consolidated books and records of Tyson.

## OVERT ACTS

16.    In furtherance of the conspiracy and to accomplish its unlawful object, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

*Improper Payments to TIF Veterinarians*

      a.    At the time Tyson Foods, Inc. acquired TdM in or around 1994, TdM listed the wives of the two TIF veterinarians on its payroll and paid them a regular salary, although the wives did not perform any services for TdM.

   b. In or around 1994, Tyson, VP International, and others attempted to halt the payments directly to the TIF veterinarians, but resumed when one of the TIF veterinarians threatened to interfere with the shipment of products from a TdM facility.  VP International then requested that the veterinarians submit "invoices" for their payments.

   c. On or around June 23, 2003, the status of one of the TIF veterinarians ("TIF A") changed from "approved" veterinarian to "official," and he was no longer permitted to receive payments from TdM.

   d. On or around May 20, 2004, the status of the one of the TIF veterinarians ("TIF B") changed from "approved" veterinarian to "official," and he was no longer permitted to receive payments from TdM.

   e. On or around June 30, 2004, a TdM plant manager sent a memorandum to an accountant at Tyson in Springdale, Arkansas regarding the payroll payments to the wives of the TIF veterinarians, stating he had been told that the wives "most definitely [] do not work for Tyson Foods in Mexico," and that he had also been told "we are paying an invoice that [TIF Veteranarian] turns in on a monthly basis...".

   f. On or around July 2, 2004, Executive, VP Audit, and others met in Springdale, Arkansas to discuss problems with an audit of TdM.  At that meeting, Accountant informed the attendees of the improper payments to the TIF veterinarians through the no-show jobs of their wives.

   g. On or around July 6, 2004, Executive, VP International, VP Audit, and others met in Springdale, Arkansas.  An attorney with Tyson's Legal Department stated he was seeking advice on "possible exposure relative to the TIF payments."

      h.      On or around July 7, 2004, Executive, VP International, VP Audit, and others met in Springdale, Arkansas to discuss "TIF payment issues," among other topics. At the meeting, one attendee noted that the purpose of the payments was to keep the TIF veterinarians from making problems at the plants; participants agreed that the payments to the wives of the TIF veterinarians had to be terminated, and Executive, VP International, and GM TdM were tasked with investigating how to shift the payroll payments to the TIF veterinarians' wives directly to the veterinarians.

      i.      On or around July 14, 2004, Executive emailed the Tyson Chief Administrative Officer regarding the resolution of the improper payments to the TIF veterinarians, noting that he had met with VP International regarding the issue.

      j.      On or around July 29, 2004, Executive, VP International, GM TdM, and others met in Mexico to discuss the improper payments to the TIF veterinarians. In the meeting, the participants discussed replacing the payroll payments with invoice payments, which Executive approved.

      k.      On or around August 26, 2004, an auditor at Tyson responsible for the audit of TdM sent an email to VP Audit, stating that they had gotten another set of incomplete payroll accounting records from TdM regarding the payroll accounts and noting, "I am beginning to think they are being intentionally evasive." VP Audit responded by email, "Let's drop the payroll stuff for now."

      l.      On or around August 26, 2004, Tyson Internal Audit created a draft document entitled "Tyson de Mexico - Payroll Memo." The memo contained the statement, "Our audit procedures identified transactions that would not be considered allowable under the

[sic] Mexican Law...." and listed the wives of the TIF veterinarians by name as individuals who were on the payroll but "did not provide any labor or service to the company." The memo also contained the statement, "The TIF doctors will submit one invoice which will include the special payments formally being made to their spouses along with there [sic] normal consulting services fee."

    m. On or around August 27, 2004, a TdM employee sent an email to GM TdM and others, including an attachment stating, "2.-TIF.-BOTH PERSONS WILL BE PULLED OUT OF THE PAYROLL ON AUGUST 31. EQUIVALENT PAYMENT WILL BE ADDED TO THE INVOICE [OF] ONE OF THEM ISSUE [sic] EVERY MONTH[.] THE NEW PAYMENT WITH INVOICE WILL BE THE ONLY ONE AND WILL BE $30,700 PS/MTH."

    n. In or around August 2004, Tyson increased the amount it paid to TIF B based on invoices for "professional honoraria" by approximately the same amount that it had previously paid to the wives of the TIF veterinarians.

    o. In or around October 2004, Tyson ceased making the payments to the wives of the TIF veterinarians.

    p. In or around October 19, 2004, the final version of the Tyson audit report on TdM was circulated to executives in Springdale, Arkansas. The audit report stated, "Detail of payroll checks issued that agreed to the balances recorded in the general ledger could not be provided. As a result we were unable to perform procedures to identify any 'ghost employees.'"

q. In or around early September 2005, a plant manager in TdM told a Tyson accountant in Springdale, Arkansas that he had been asked to authorize the payments to the TIF veterinarians and that he was uncomfortable doing so.

r. On or around September 10, 2005, Accountant (then General Manager of TdM) emailed the plant manager at TdM, stating, "I talked to [Executive] this week about the invoice from [TIF B] that we pay. He agreed that we are OK to continue to make these payments against invoices (not through payroll) until we are able to get TIF/SAGARPA to change."

*Total Improper Payments*

s. From the time Tyson Foods, Inc. acquired TdM in or around 1994 through in or around 2006, Tyson made occasional additional improper payments to the TIF veterinarians on an ad-hoc basis.

t. In total, from in or around July 2004 to in or around November 2006, Tyson, its executives, and its subsidiaries authorized the payment, directly or indirectly, of approximately $90,000 to Mexican government-employed veterinarians, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program, resulting in profits of approximately $880,000. From the time of Tyson's acquisition of TdM in 1994 until May 2004, an additional $260,000 in improper payments were made to the TIF veterinarians, both directly and indirectly, including through payments to wives of the TIF veterinarians.

*Books and Records*

u. At the end of each of Tyson's fiscal years from in or around 2004 to in or around 2006, the books and records of TdM, including those containing false characterizations of

10

the payments to the TIF veterinarians as "professional fees" based on invoices for "professional honoraria," were incorporated into the books and records of Tyson for purposes of preparing Tyson's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

        (All in violation of Title 18, United States Code, Section 371.)

## COUNT TWO
## (Foreign Corrupt Practices Act)

16. Paragraphs 1 through 13 and 16 through 18 of this Information are re-alleged and incorporated as if fully set forth herein.

17. From in or around July 2004 through in or around November 2006, within the territory of the United States and elsewhere, defendant Tyson Foods, Inc., an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to any foreign official for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist defendant Tyson Foods, Inc. in obtaining and retaining business; to wit, in order to obtain or retain business for TdM by influencing the decisions of veterinarians responsible for certifying TdM products for export under the TIF Program, defendant Tyson Foods Inc. made and caused to be made, directly and indirectly, improper payments totaling approximately $90,000 to Mexican government-

employed TIF veterinarians, and mischaracterized such payments on the consolidated books and records of Tyson Foods, Inc. as "professional fees" and salaries.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), 78ff(a), and 78dd-1 and Title 18, United States Code, Section 2.)

DENIS J. MCINERNEY
Chief, Fraud Section

CHARLES E. DUROSS
Deputy Chief, Fraud Section

By: _____
Kathleen M Hamann
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 305-7413